* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Taylor and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence, and upon reconsideration, the Full Commission modifies in part and reverses in part the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. This case is subject to the Workers' Compensation Act; there was an employment relationship on the date of injury; plaintiff sustained a compensable injury by accident on March 12, 2001, and defendant accepted this claim.
2. Defendant is self-insured.
3. The parties stipulated into evidence all Industrial Commission orders and forms filed with the Commission in this case, the Pre-Trial Agreements submitted in the first two hearings, and the hearing transcripts for the two previous hearings in this case on January 15, 2002 and March 26, 2002.
4. The parties stipulated into evidence a numbered set of plaintiff's medical records from the following health care providers: Scotland Orthopedics, Scotland Memorial Hospital, Neurology Center of the Carolinas, Laurinburg ENT Clinic, Dr. Jute, Duke Eye Clinic, Duke Brain Injury Clinic, Concentra, Scotland Neurology, Carolina Psychiatric Services, Highland Health of North Carolina, Triangle Orthopaedic Associates, Sandhills Neurosurgery, North Carolina Neuropsychiatry, Dr. Logue, Verne Schmickley, Ph.D., Pinehurst Surgical Clinic, Joseph Appollo, Ph.D., ARI, Carolina Urology, and Florence Neurosurgery.
5. The following exhibits submitted by plaintiff were received into evidence at the Deputy Commissioner's hearing:
 (3A) April 2003 letter from attorney Heidi Chapman to attorney George Pender regarding mileage to Duke Medical Center and Dr. Appollo;
 (3B) July 9, 2004 letter from Ms. Chapman to attorney Jan Pittman regarding mileage to Scotland Memorial Hospital for physical therapy;
 (4) I.C. Form 25Ts for mileage to Dr. Appollo;
 (5) Dr. Appollo's ledger of charges;
 (6) Dr. Logan's ledger of charges and payments;
 (7) Diagram of plaintiff's accident;
 (8) Photograph of plaintiff and his grandchildren;
 (9) Emergency response team report;
 (10) Two I.C. Form 60s dated March 19, 2001 and May 16, 2002;
 (11) Incident investigation report; and
 (12) Chart summarizing treatments ordered, approvals and denials.
6. The parties stipulated into evidence the following exhibits after the Deputy Commissioner's hearing:
 (13) A binder containing the exhibits from the January 15, 2002 Hearing I;
 (14) A binder containing the exhibits from the February 26, 2002 Hearing II; and
 (15) A second and more complete set of Stipulated Medical Record Books I and II.
7. After the Deputy Commissioner's hearing, the following exhibits submitted by plaintiff were received into evidence:
 (16) 2002 Publication from the National Institute of Neurological Disorders and Stroke at the National Institutes of Health, entitled TRAUMATIC BRAIN INJURY;
 (17) Defendant's Unverified Responses to Plaintiff's First Set of Interrogatories with Exhibit #1, plaintiff's medical or health file, served by mail on plaintiff on September 10, 2004;
 (18) Plaintiff's Motion to Compel Discovery served on September 22, 2004;
 (19) Defendant's Unverified Responses to Plaintiff's First Request for Production of Documents to defendant and the attached personnel file of plaintiff;
 (20) Defendant's Unverified Revised Responses to Plaintiff's First Set of Interrogatories pursuant to Deputy Commissioner Taylor's request; and
 (21) Defendant's Unverified Responses to Plaintiff's First Request for Production of Documents.
8. Plaintiff contends the contested issues before the Commission are as follows:
 a. Should plaintiff be allowed to return to Dr. Liebelt at Triangle Orthopedic Associates for a postoperative right knee evaluation due to ongoing pain and for a second opinion pursuant to N.C. Gen. Stat. § 97-27(a) on the bulging discs in his neck and back, since defendant has had plaintiff evaluated by Drs. Hucks-Folliss and Naso?
 b. Is Dr. Appollo plaintiff's authorized treating psychologist effective from October 28, 2002 until he is released, as ordered by plaintiff's authorized treating physicians?
 c. Is Dr. Appollo entitled to payment for his treatment and penalties pursuant to N.C. Gen. Stat. § 97-18(i)?
 d. Should plaintiff be allowed to return to Dr. Logue at Duke for another neuropsychological evaluation, pursuant to N.C. Gen. Stat. § 97-27(a), since defendant has had plaintiff submit to two IMEs by Dr. Gualtieri and one IME by Dr. Schmickley?
 e. Should defendant pay Dr. Edwards' charges for treatment on April 23, 2001 and May 1, 2002 at Duke, including late payment penalties pursuant to N.C. Gen. Stat. § 97-18(i), for treatment ordered by Dr. Fozdar, a Duke neuropsychiatrist?
 f. Should defendant pay Dr. Fozdar's charges for treatment on May 16, 2002 at Duke, including late payment penalties pursuant to N.C. Gen. Stat. § 97-18(i), for treatment ordered by Dr. Logue, an authorized treating health care provider?
 g. Is plaintiff entitled to reimbursement for travel to Drs. Fozdar, Edwards and Appollo, Scotland Memorial Hospital, Dr. Gualtieri, Open MRI of Florence, Carolina Psychiatric Services, Scotland Neurology, and Highland Health of NC and late payment penalties pursuant to N.C. Gen. Stat. § 97-18(i)?
 h. Is plaintiff entitled to cognitive retraining and cognitive behavioral therapy as ordered by three of plaintiff's authorized treating physicians, Dr. Logan, Dr. Mahon and Dr. Walsh?
 i. Is plaintiff entitled to prescriptions for Viagra as ordered by Drs. Logan and Mahon for erectile dysfunction resulting from his work-related injury?
 j. Is plaintiff entitled to ongoing medical treatment for his Parkinson's symptoms due to the head injury he sustained in his work-related accident on March 12, 2001, as ordered by his authorized treating physicians?
 k. Is plaintiff entitled to additional biofeedback treatments as ordered by Drs. Fozdar, Mahon and Logue?
 l. Is plaintiff entitled to ongoing Botox injections to relieve pain and treat the muscle spasms in his neck, shoulders, and back?
 m. Is plaintiff entitled to the use of a TENS unit on an ongoing basis to relieve his neck and back pain?
 n. Is plaintiff's wife entitled to counseling with Dr. Logan to help her deal with plaintiff's mood swings and disability due to his work-related injuries?
 o. Is plaintiff able to return to work given all his work-related injuries?
 p. Has defendant repeatedly violated Industrial Commission Rule 407(4) by denying medical treatment and unreasonably delaying medical treatment ordered by plaintiff's authorized treating physicians that would lessen his pain and decrease his disability?
 q. Is defendant subject to costs pursuant to N.C. Gen. Stat. § 97-88.1, including but not limited to attorney's fees, for unreasonably defending this claim?
 r. Is plaintiff's wife entitled to payment for her attendant care of plaintiff, including but not limited to her time spent taking plaintiff for medical treatment and performing all the household duties that plaintiff is no longer able to perform?
9. Defendant contends the contested issues to be determined by the Commission are:
 a. Is plaintiff's alleged erectile dysfunction and recommendation that he take Viagra for said condition causally related to plaintiff's admittedly compensable March 12, 2001 injury?
 b. Does plaintiff suffer from Parkinson's disease and, if so, is said condition causally related to the March 12, 2001 workers' compensation claim?
 c. Does plaintiff's wife need psychological counseling and, if so, is her need for counseling causally related to plaintiff's March 12, 2001 workers' compensation claim and is it considered a compensable condition for which defendant is obligated to pay pursuant to the provisions of the North Carolina Workers' Compensation Act?
 d. Is defendant entitled to have plaintiff seen for an independent neurological examination?
 * * * * * * * * * * * RULING ON EVIDENTIARY MATTER
Defendant moved the Full Commission to receive additional evidence of the reports and video CD tape of surveillance of plaintiff by private investigators. Plaintiff filed a response in opposition to said motion. The Commission grants defendant's motion and receives the surveillance tape and reports into evidence.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the Deputy Commissioner's hearing, plaintiff was 54 years old and was born on May 29, 1950.
2. On March 12, 2001, plaintiff was working as a loader in defendant's glass manufacturing facility. Plaintiff worked for defendant for 29 years in various physically demanding jobs. Plaintiff earned an average weekly wage of $803.60, yielding a compensation rate of $535.73 per week.
3. Plaintiff sustained an admittedly compensable injury by accident on March 12, 2001, when an unsecured case of glass weighing approximately 4,200 pounds fell, striking plaintiff in the top of his head, knocking off his hard hat, popping his neck, throwing him forward into another case of glass, and knocking him to the ground. Immediately after the accident, plaintiff had a headache, blurred vision, sharp burning pain at the back of his head, and numbness in his legs. Plaintiff sustained injuries to his head, neck, back, and right leg in this compensable injury by accident. Defendant accepted the compensability of the accident by filing a Form 60.
4. Defendant's Emergency Response Team documented that the case of glass hit plaintiff in the head, causing pain in his head, neck and lower back and that plaintiff complained of severe pain in his right leg and a severe headache.
5. Plaintiff was taken by ambulance to Scotland Memorial Hospital where he was diagnosed with cervical and lumbar strains and a sprained right knee.
6. On March 13, 2001, plaintiff presented to Dr. Philip Holzknecht, an orthopaedic surgeon. Dr. Holzknecht diagnosed plaintiff with cervical and lumbar strains, degenerative disc disease, and internal derangement of the right knee with possible ACL and lateral meniscus tears. Dr. Holzknecht noted tenderness in plaintiff's neck and edema in the back of his head and neck. He also noted tenderness in plaintiff's lower lumbar spine and paraspinal muscles. Dr. Holzknecht released plaintiff to return to sedentary work, on crutches, with a knee brace, for four hours per day. Dr. Holzknecht was of the opinion that plaintiff's accident significantly exacerbated his lumbar degenerative disc disease symptoms in his lower back.
7. Plaintiff had a pre-existing history of lumbar degenerative disc disease. Plaintiff was treated for this condition by his family physician, Dr. James Currin, Jr., beginning in 1997 and was taken out of work on three occasions for periods of three days to three weeks. Dr. Currin did not treat plaintiff for cervical spine problems, except for an acute cervical strain in October 1993. Dr. Currin was of the opinion that plaintiff's March 12, 2001 compensable injury aggravated plaintiff's pre-existing degenerative disease of the lumbar spine.
8. On March 16, 2001, plaintiff returned to Scotland Memorial Hospital complaining of pain in his occipital head and both ears, a loss of taste and appetite, dizziness, and nausea. He also had a stiff neck, tenderness in his jaw, and very tender trapezius muscles. A March 19, 2001 MRI of plaintiff's right knee showed a tear of the posterior horn of the medial meniscus and a lateral tibial plateau compression fracture.
9. On March 22, 2001, Scotland Memorial Hospital referred plaintiff to Dr. Timothy Sullivan, a neurologist. Dr. Sullivan initially diagnosed plaintiff with a minor to modest concussion, cervical whiplash, low back and right knee injury. He also noted that plaintiff had a stiff neck and a left eye squint/blepharospasm. Dr. Sullivan wrote plaintiff completely out of work. Plaintiff has not returned to work for any employer since March 22, 2001. Defendant authorized Dr. Sullivan's neurological treatment and assigned Rosa Britt, a case manager, to accompany plaintiff to his appointments with Dr. Sullivan. In May 2001, Dr. Sullivan treated plaintiff with Botox injections for cervical dystonia, spasmodic torticollis and blepharospasm.
10. In May 2001, plaintiff saw Dr. Thomas Gualtieri, a neuropsychiatrist. Dr. Gualtieri felt plaintiff sustained a concussion, but he could not find evidence of impairment to plaintiff's central nervous system. He also noted that plaintiff was depressed and recommended intensified pain management treatment, as well as treatment for depression.
11. In June 2001, plaintiff's treating orthopedic surgeon, Dr. Holzknecht, relocated to Texas. Plaintiff has had no treating orthopedic surgeon for his neck and back since June 2001.
12. On July 18, 2001, plaintiff presented to Dr. Ralph Liebelt, an orthopedic surgeon, for an independent medical evaluation of his neck and back and a second opinion on proposed knee surgery. Dr. Liebelt diagnosed plaintiff with aggravation of cervical and lumbar degenerative disc disease, cervical and lumbar strain, cervical and lumbar contusion, medial meniscus tear, healed tibial plateau fracture, and a head injury with post concussive syndrome. Dr. Liebelt related all of these diagnoses to plaintiff's March 12, 2001 compensable accident. Dr. Liebelt observed plaintiff's cognitive problems during the examination. Dr. Liebelt recommended conservative treatment for plaintiff's back injury, and indicated that ultimately an anterior cervical decompression/fusion could be considered. Dr. Liebelt also recommended an arthroscopic evaluation of plaintiff's right knee. Dr. Liebelt noted that prior to plaintiff's compensable injury, plaintiff had pain down only one leg. However, following the injury, plaintiff had pain radiating down both legs. Dr. Liebelt was of the opinion that this pain pattern difference was significant and represented an aggravation of plaintiff's pre-existing degenerative disc disease, as well as an acute injury to plaintiff's disc.
13. On August 23, 2001, plaintiff filed a Motion for a Change of Treating Physician, after Dr. Holzknecht moved to Texas. Plaintiff asked that he be allowed to treat with Dr. Liebelt for his neck, back and right knee. The Executive Secretary issued an Order on September 28, 2001, ordering the parties to agree on a new treating physician. Plaintiff appealed. Deputy Commissioner Baddour reserved ruling on plaintiff's Motion for a Change of Treating Physician and allowed defendant to designate Dr. Malcolm Shupeck at Pinehurst Surgical Associates as plaintiff's new treating physician. However, defendant did not provide treatment with Dr. Shupeck with the exception of a one-time consultation in May 2002. Plaintiff requested authorization of Dr. Liebelt to provide ongoing orthopedic care for his neck and back and perform his anterior cervical decompression and fusion.
14. In August 2001, Dr. Sullivan diagnosed plaintiff with post-concussion syndrome, cognitive deficits and memory and concentration problems. He suspected plaintiff had organic brain damage. Dr. Sullivan observed symptoms of emotional lability and post-traumatic stress disorder. Dr. Sullivan referred plaintiff to Dr. Keith Logan, a psychiatrist, for evaluation of plaintiff's emotional state and possible post-traumatic stress disorder.
15. On September 4, 2001, Dr. Logan diagnosed plaintiff with traumatic brain injury with serious cognitive impairment, major depression with anxious features, and post-traumatic stress disorder. Although plaintiff was referred to Dr. Logan by his authorized treating physician, Dr. Sullivan, defendant denied authorization for Dr. Logan's treatment until the March 2002 hearing.
16. Dr. Logan referred plaintiff to Dr. Manish Fozdar, a neuropsychiatrist at Duke, who diagnosed post-traumatic stress disorder, cognitive dysfunction, depressive disorder, generalized anxiety disorder and post concussion dizziness and vertigo. Dr. Logan stated that plaintiff has brain injury caused by his compensable injury.
17. On October 11, 2001, Dr. Sullivan observed several myoclonic jerks during plaintiff's office visit. On December 10, 2001, Dr. Sullivan noted that plaintiff was continuing to have diffuse fasciculations and radiculopathic pain in the bilateral upper and lower extremities.
18. After plaintiff's visit on January 14, 2002, Dr. Sullivan stopped practicing medicine. Plaintiff had no treating neurologist from January 14, 2002 until March 2003, when Dr. John Mahon assumed his care.
19. Plaintiff's personality and cognitive abilities changed after his March 12, 2001 compensable accident. He became very emotional and had difficulty controlling his temper. After his compensable injury, plaintiff could not concentrate, had difficulty remembering names and conversations, and had difficulty getting words out. Plaintiff developed a left eye droop and tremors shortly after the accident. Plaintiff's tremors worsened over time. By January 15, 2002, due to his tremors, plaintiff had to use one hand to keep the other hand still.
20. In February 2002, case manager Rosa Britt closed her file on plaintiff. Plaintiff had no case manager until Laurie McTavish was assigned to his case in November 2002.
21. On February 12, 2002, Dr. Gualtieri reevaluated plaintiff and felt plaintiff had more severe problems than in May 2001, including tremors, poor coordination and poor balance. At that time, Dr. Gualtieri felt plaintiff had developed post-traumatic stress disorder and that plaintiff's psychological state had been aggravated by his injury. He again recommended chronic pain and psychiatric treatment.
22. In February 2002, on an earlier referral from Dr. Sullivan, plaintiff underwent a neuropsychological evaluation with Dr. Patrick Logue. Dr. Logue noted a tremor in plaintiff's right upper extremity and returned plaintiff to Dr. Fozdar at Duke Neuropsychiatry who treated plaintiff from April 2002 until September 2002.
23. Dr. Logue also referred plaintiff to Dr. Edwards for biofeedback. In April and May 2002, Dr. Edwards recommended ongoing biofeedback treatment for plaintiff. Defendant did not authorize this treatment even though the referral was made by a doctor in the direct referral chain from plaintiff's authorized treating physician, Dr. Sullivan.
24. In May 2002, plaintiff underwent a neurosurgical evaluation with Dr. Shupeck at defendant's request. Dr. Shupeck documented plaintiff's tremors, noting that plaintiff was intermittently tremulous and shaking his head to the side. Dr. Shupeck was of the opinion that plaintiff might need two major surgeries, including one on his neck. Defendant never allowed plaintiff to return to Dr. Shupeck.
25. On March 13, 2002, plaintiff returned to Dr. Liebelt for treatment of his right knee. Defendant authorized Dr. Liebelt to treat plaintiff's right knee, but not his neck and back. Dr. Liebelt was concerned that plaintiff's ongoing problems in his neck and lower back had not been addressed in any fashion.
26. On August 5, 2002, Dr. Liebelt performed right knee surgery on plaintiff. As of March 24, 2003, plaintiff reached maximum medical improvement of his right leg and retained a 15% permanent disability to his right leg. Since March 24, 2003, plaintiff has been treated by Dr. Liebelt and has suffered a progression of degenerative change in his knee. As of November 11, 2004, plaintiff had osteoarthritis of the right knee and underwent steroid injections. If plaintiff's condition worsens, plaintiff bears a substantial risk of requiring viscosupplementation and eventually, total knee replacement. Dr. Leibelt felt and the Commission finds that plaintiff's knee symptoms and defects were caused by his workplace injury.
27. On October 10, 2002, Dr. Liebelt recommended that plaintiff undergo an evaluation by a physiatrist at Triangle Orthopaedic Associates for non-operative measures to treat his neck and back. Defendant did not authorize the evaluation.
28. Plaintiff was referred by Dr. Fozdar to Dr. Joseph Appollo, a clinical psychologist. On October 28, 2002, plaintiff began treating with Dr. Appollo and continued to treat with him at the time of Deputy Commissioner Taylor's hearing. Dr. Appollo diagnosed plaintiff with major depression and post-traumatic stress disorder.
29. As of February 4, 2003, Dr. Logan recommended for a second time that plaintiff be treated with psychotherapy. He further informed defendant that plaintiff needed care at a higher level than a social worker. On March 25, 2003, Dr. Logan recommended that plaintiff continue treatment with Dr. Appollo.
30. Until February 2005 defendant refused to pay Dr. Appollo for the treatment he provided plaintiff from October 28, 2002 to November 23, 2004. Despite multiple referrals from plaintiff's authorized treating physicians, defendant refused to authorize Dr. Appollo's treatment until the day of the September 2004 hearing. Dr. Appollo has received none of the penalties and interest defendant was ordered to pay in February 2005. Defendant did not appeal Deputy Commissioner Taylor's award of interest and did not comply with the Deputy Commissioner's Order. At the time of the Deputy Commissioner's hearing, Dr. Appollo had not received payment for his treatment from November 24, 2004 to that time. Defendant has repeatedly delayed payment to or failed to pay Dr. Appollo, even after representing to the Commission that they would do so.
31. On January 13, 2003, case manager Laurie McTavish met with plaintiff for the first time. Plaintiff sat with his head flexed forward and did not move his head to either side due to severe neck pain. Plaintiff told Ms. McTavish that the Botox injections he previously received had relieved some of the stiffness in his neck for two to three months but he had not had an injection for nearly a year. Ms. McTavish saw the periodic jerking movement of plaintiff's head and slight tremor of his hands. Plaintiff told Ms. McTavish that both his legs gave way.
32. Defendant authorized plaintiff to begin treating with Dr. Zane Walsh, a physiatrist in Fayetteville, on February 11, 2003. Dr. Walsh believed that the majority of plaintiff's neck and back pain was due to his traumatic brain injury and depression. Dr. Walsh recommended psychiatric treatment, counseling and a repeat neurological battery.
33. Due to his severe exacerbation of pain, Dr. Logan referred plaintiff to Dr. John Mahon, a neurologist. On March 19, 2003, plaintiff presented to Dr. Mahon, who immediately diagnosed plaintiff with post-traumatic Parkinson's disease and prescribed Sinemet. Plaintiff's Parkinson's symptoms have not deteriorated since taking Sinemet. Defendant has paid for plaintiff's Sinemet. When plaintiff presented to Dr. Mahon, he had extreme difficulty moving and took considerable time to walk across the floor. Dr. Mahon was of the opinion and the Commission finds that plaintiff's Parkinson's was caused by his March 12, 2001 compensable injury. Trauma can cause Parkinson's and plaintiff's Parkinson's is not the typical development of Parkinson's, as his condition has developed extremely quickly. Plaintiff developed difficulty walking in one to two years, instead of the average 15 to 30 years that it would take for non-trauma Parkinson's to develop.
34. On March 26, 2003, Dr. Logue, after reevaluating plaintiff, recommended cognitive behavioral therapy and cognitive retraining. Plaintiff's treating physicians, Drs. Mahon, Logan and Walsh, agreed with Dr. Logue's recommendation. Defendant never approved this treatment.
35. During Dr. Mahon's second evaluation of plaintiff on April 1, 2003, Dr. Mahon diagnosed plaintiff with severe concussion with post-concussion syndrome; depression, personality change and memory problems secondary to the concussion; post-traumatic migraine; post-traumatic Parkinson's disease; spinal cord contusion with permanent residual; significant spinal cord compression; and post-traumatic vertigo. Dr. Mahon was of the opinion that plaintiff's diagnoses were causally related to his March 12, 2001 work-related accident. Plaintiff has continued treating with Dr. Mahon until at least the time of the Deputy Commissioner's hearing. Dr. Mahon administered Botox injections to plaintiff to treat his severe neck pain, which relieved plaintiff's neck pain and helped make him more emotionally stable.
36. Dr. Mahon also felt that plaintiff has erectile dysfunction because of his post-concussion syndrome, depression and cervical spinal cord trauma, all of which were caused by plaintiff's compensable March 12, 2001 injury. Dr. Mahon further stated that treating plaintiff's erectile dysfunction with Viagra would improve plaintiff's overall psychological status. Defendant denied payment of plaintiff's prescriptions for Viagra. Dr. Mahon began prescribing Viagra in April 2003, and Dr. Logan has also prescribed Viagra. Viagra has allowed plaintiff and his wife to resume a sexual relationship. Drs. Walsh, Logan and Mahon were of the opinion and the Commission finds that plaintiff's erectile dysfunction was caused by his March 11, 2001 compensable injury.
37. Dr. Mahon stated that plaintiff requires regular counseling with Dr. Appollo, as well as biofeedback and cognitive retraining, due to his post-concussion syndrome, depression and other accident-related conditions. Dr. Mahon explained that the counseling with Dr. Appollo makes plaintiff feel better, that biofeedback would give plaintiff a focus other than pain and anxiety, and that cognitive retraining would help with plaintiff's memory deficit. Dr. Mahon recommended these treatments as early as July 2003.
38. Dr. Mahon was further of the opinion that plaintiff's depression and psychological trauma are not the result of or related to plaintiff's Parkinson's symptoms because these psychological conditions predated plaintiff's manifestation of Parkinson's symptoms.
39. Dr. Mahon testified that plaintiff's lumbar pain following his March 11, 2001 compensable injury was caused and/or aggravated by plaintiff's compensable injury and not his pre-existing lumbar condition because plaintiff was struck with enough force to damage his cervical spinal cord, lose feeling in his legs temporarily and sustain a compression break of the tibial plateau. Dr. Mahon diagnosed plaintiff with ulnar neuropathy, caused by plaintiff's propensity to lean forward on his arms to compensate for his back pain from his compensable injury. Dr. Mahon stated that plaintiff is very impaired, even without his post-traumatic Parkinson's, due to his pain and cognitive and emotional dysfunction. Dr. Mahon did not think there was any chance plaintiff would ever return to work.
40. In October 2003, Dr. Gualtieri found plaintiff was still suffering from chronic pain and that plaintiff had continuing psychiatric problems that were in some way either caused or aggravated by the injury. Dr. Gualtieri felt that plaintiff would not benefit from cognitive retraining or cognitive rehabilitation and that plaintiff's sexual dysfunction was indirectly related to his March 12, 2001 injury.
41. On March 4, 2004, after reviewing the results of plaintiff's February 25, 2003 cervical and lumbar MRI films, Dr. Walsh referred plaintiff to Dr. Anthony Hucks-Folliss, a neurosurgeon who no longer performs surgery, for a surgical evaluation due to plaintiff's significant stenosis at C4-5, failure to respond to extensive conservative treatment and continuing symptoms. Defendant authorized the neurosurgical evaluation.
42. On April 7, 2004, Dr. Hucks-Folliss ordered a myelogram and concluded that cervical and lumbar surgeries should be considered. Plaintiff had both cord and bilateral root compression at C5-6. Dr. Hucks-Folliss was of the opinion that plaintiff's spinal cord compression contributed to plaintiff's symptoms and created a high risk of paralysis. Dr. Hucks-Folliss recommended surgery to prevent further deterioration. Dr. Hucks-Folliss felt that without neck surgery plaintiff would likely develop spasticity in the legs, increased problems with walking and irreversible damage to his spinal cord. Dr. Hucks-Folliss stated that plaintiff had a significant head and neck injury as a result of his March 21, 2001 compensable injury. Dr. Hucks-Folliss testified that plaintiff's cognitive problems relate to plaintiff's head injury and that plaintiff's report of "stroking out" and loss of feeling in his legs were related to plaintiff's spinal cord concussion. Dr. Hucks-Folliss further stated that plaintiff's spinal cord injury occurred in his neck. Although plaintiff had pre-existing lumbar and cervical disease, Dr. Hucks-Folliss believed that plaintiff's compensable March 21, 2001 injury caused an exacerbation of his pre-existing condition, which was definitely considerably worsened and caused significantly more symptoms following the trauma. Dr. Hucks-Folliss explained that he would not expect to see significant spinal cord involvement, as suggested by plaintiff's EMGs, without traumatic injury to the spinal cord and that he would not expect to see the spinal cord involvement with degenerative disc disease alone.
43. Dr. Hucks-Folliss and Dr. Liebelt were of the opinion and the Commission finds that if plaintiff did not have surgery, his spinal cord compression and nerve root compression would worsen, causing further weakness in his upper extremities.
44. On August 16, 2004, plaintiff had a second neurosurgical evaluation with Dr. William Naso, whom plaintiff saw only once. Defendant authorized this evaluation. Dr. Naso attributed plaintiff's pain radiating down his arms and legs to a cervical spinal cord injury, but was not convinced that cervical surgery would relieve all of plaintiff's symptoms and thus did not recommend surgery for plaintiff.
45. On December 20, 2004, plaintiff returned to Dr. Liebelt for an independent medical evaluation. Defendant did not authorize this evaluation. Dr. Liebelt concluded that an anterior cervical decompression and fusion would be appropriate at C4-5 and C5-6. Dr. Liebelt felt that without surgery, plaintiff could expect further weakness in his arms and potentially his legs, and that the cervical fusion would reduce plaintiff's radicular pain and prevent further deterioration of function in both plaintiff's upper and lower extremities. Dr. Liebelt and Dr. Hucks-Folliss felt that plaintiff's need for surgery was urgent, as more nerve damage was being done to plaintiff daily. Plaintiff also exhibited poor memory, cervical dystonia, headaches and migraines, pinched nerves in his arms/legs, dizziness and head/neck spasms. Plaintiff's balance had also been affected. Dr. Liebelt was willing to perform plaintiff's neck surgery and felt surgery was essential to prevent further disability.
46. Dr. Liebelt testified that the type of and time of progression plaintiff has seen in his condition is usually not seen with degenerative disc disease without trauma and cord compression/damage, an opinion shared by Dr. Hucks-Folliss.
47. On February 22, 2005, Dr. Walsh re-evaluated plaintiff and reviewed the reports from Drs. Naso, Hucks-Folliss and Liebelt, and, upon reconsideration, believed plaintiff was a surgical candidate. Dr. Walsh felt it was reasonable to proceed with neck surgery and that the surgery would allow cervical decompression and likely benefit plaintiff. Dr. Walsh stated that without surgery, plaintiff's symptoms would remain the same or worsen. Dr. Walsh recommended surgery because with plaintiff's degree of stenosis, plaintiff was at risk for quadriplegia in a minor accident, an opinion shared by Dr. Hucks-Folliss and Dr. Liebelt. Dr. Walsh also stated that plaintiff's pre-existing cervical degenerative disk disease was aggravated by plaintiff's March 12, 2001 compensable injury and that plaintiff's cervical dystonia, torticollis and blepharospasm were also caused by the accident.
48. Following the filing of the Deputy Commissioner's Opinion and Award, on December 20, 2005, Dr. Liebelt performed anterior cervical decompression fusion surgery on plaintiff at the C4-5 and C5-6 levels.
49. At the September 23, 2004 hearing before the Deputy Commissioner, defendant authorized Dr. Appollo's treatment retroactively to October 28, 2002, and authorized some cognitive behavioral therapy, cognitive retraining and biofeedback. At the time of the filing of the Deputy Commissioner's Opinion and Award, defendant had not authorized any other cognitive behavioral therapy, cognitive retraining or biofeedback, even though it was recommended by Drs. Logue, Logan, Walsh and Mahon.
50. Dr. Logan, plaintiff's treating psychiatrist, recommended a neuropsychological evaluation with Dr. L. Randolph Waid, a neuropsychologist in South Carolina, prior to plaintiff beginning cognitive retraining. Dr. Logan believes that Dr. Waid will be able to determine the types of therapies that will be most beneficial to plaintiff. Plaintiff requested a neuropsychological re-evaluation by Dr. Logue, but has agreed to change to Dr. Waid. Defendant attempted to schedule a psychological evaluation with Dr. Leach and an IME with Dr. Fozdar, but plaintiff refused to submit to these evaluations. Dr. Logan stated that plaintiff's symptoms are not likely to resolve psychiatrically or cognitively. Further, Dr. Logan felt that plaintiff will most likely remain near his current functional level and will always require additional treatment and support to ensure that his condition does not progressively worsen. Dr. Logan stated that plaintiff will never be able to return to work and that plaintiff's March 11, 2001 compensable injury caused or significantly aggravated his depression, anxiety and post-traumatic stress disorder.
51. Dr. Logan has recommended that Mrs. Sampson, plaintiff's wife, become involved in a counseling program to help her deal with plaintiff's medical conditions. However, plaintiff's wife was not an employee of defendant and did not sustain any injuries in plaintiff's accident on March 12, 2001, and thus is not entitled to have defendant pay for any of her medical treatment.
52. Although Mrs. Sampson is employed full time, she or other family members drive plaintiff to all his medical appointments. Mrs. Sampson usually attends plaintiff's medical appointments, as does the nurse case manager provided by defendant. Mrs. Sampson has also taken on household chores that she and plaintiff used to share. Plaintiff requested reimbursement for Mrs. Sampson's attendant care services for accompanying plaintiff to medical appointments and performing additional household duties. However, attendant care for plaintiff has not been prescribed or directed by any physician. Although Dr. Mahon stated that Mrs. Sampson's presence was helpful at plaintiff's appointments, he also stated that Ms. McTavish was extremely helpful, "wonderful" to work with, and was able to convey medical information from physicians to plaintiff. Defendant has also expressed a willingness to provide plaintiff's transportation to doctors' appointments.
53. Defendant has not paid plaintiff for the travel expenses on the I.C. Form 25T submitted to Mr. Pender on April 21, 2003, totaling $662.78, and on the I.C. Form 25T submitted to Ms. Pittman on July 9, 2004, for medical treatment with authorized treating physicians, including Dr. Appollo, totaling $612.91. Plaintiff has also accrued additional mileage for treatment with Dr. Appollo from April 9, 2003 to the present.
54. The Full Commission finds by the greater weight of the evidence that as a direct and proximate result of plaintiff's compensable March 12, 2001 injury by accident, plaintiff sustained severe concussion with post-concussion syndrome, depression, personality change, post-traumatic stress disorder, memory problems, post-traumatic migraines, post-traumatic Parkinson's disease, spinal cord contusion with permanent residual, spinal cord compression, post-traumatic vertigo, right knee injury, ulnar neuropathy, debilitating pain, and loss of function. The greater weight of the evidence also shows that without surgery to allow cervical decompression and fusion, plaintiff's symptoms were expected to worsen.
55. The Full Commission finds by the greater weight of the evidence that as a direct and proximate result of plaintiff's March 12, 2001 compensable injury and the conditions resulting therefrom, plaintiff has been unable to engage in employment or earn the same or any other wages with defendant or any other employer since March 22, 2001. Both Dr. Logan and Dr. Mahon felt plaintiff was permanently disabled from working. The Commission finds that plaintiff is totally and permanently disabled from any employment.
56. The Commission has considered the surveillance reports and tape of plaintiff. However, the Commission gives greater weight to the expert medical opinions of plaintiff's treating physicians concerning the extent of plaintiff's disability than to the surveillance results.
57. Defendant made a motion for attorney's fees for the cancellation of Dr. John Smid's deposition and for unreasonable delays prior to the taking of the depositions of Dr. Gualtieri and Dr. Currin. The Commission finds that plaintiff's attorney's conduct in stopping defense attorney's cross examination of Dr. Smid was inappropriate, in that it is the role of the Commission to rule on evidentiary objections after the completion of depositions. Therefore, defendant is entitled to reasonable attorney's fees as a sanction for interfering with discovery. Defendant submitted an affidavit of the time defense counsel spent at Dr. Smid's deposition. The Commission finds that defendant is not entitled to attorney's fees for the delay in taking the depositions of the medical experts. However, the reasonable and appropriate practice would have been for plaintiff's attorney to schedule a consultation with the doctors prior to the scheduled time for the depositions so as to not cause a delay in beginning the depositions of Drs. Gualtieri and Currin.
58. Defendant has repeatedly delayed plaintiff's medical treatment or failed to authorize treatment that was recommended by physicians within the chain of referral from plaintiff's authorized treating doctors. Defendant's conduct resulted in the deterioration of plaintiff's medical condition. Therefore, the Commission finds that defendant has defended this case without reasonable grounds. In addition, defendant has repeatedly agreed to pay or been ordered to pay for treatment, but has not paid for such treatment in a timely matter.
59. Plaintiff has not prosecuted this action without reasonable grounds.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On March 12, 2001, plaintiff sustained an admittedly compensable injury by accident and, as a result, plaintiff sustained severe concussion with post-concussion syndrome, depression, personality change, post-traumatic stress disorder, memory problems, post-traumatic migraines, post-traumatic Parkinson's disease, spinal cord contusion with permanent residual, spinal cord compression, post-traumatic vertigo, right knee injury, ulnar neuropathy, debilitating pain, and loss of function. N.C. Gen. Stat. § 97-2(6).
2. As a result of plaintiff's March 12, 2001 compensable injury and the conditions resulting therefrom, plaintiff has been unable to work in any employment from March 22, 2001 to the present. The greater weight of the medical evidence indicates that plaintiff is currently unable to work and will continue to be unable to work in the competitive labor market in the future. Therefore, the Commission finds that plaintiff is totally and permanently disabled and is entitled to permanent and total disability compensation at the rate of $535.73 per week from March 22, 2001 and continuing for plaintiff's lifetime. N.C. Gen. Stat. § 97-29.
3. Plaintiff is entitled to have defendant provide medical treatment for the conditions caused by his March 12, 2001 compensable injury so long as the same is reasonably designed to effect a cure, provide relief or lessen plaintiff's period of disability. The medical treatment which plaintiff is entitled to receive includes, but is not limited to, biofeedback, cognitive retraining, cognitive behavioral therapy, psychological counseling, psychiatric treatment, Botox injections, Viagra, treatment for post-traumatic Parkinson's syndrome, further treatment for his right knee, treatment for ulnar neuropathy, anterior cervical decompression fusion at C4-5 and C5-6, plaintiff's December 20, 2004 evaluation with Dr. Liebelt, and any other treatment necessitated by the compensable conditions and injuries plaintiff sustained and the complications arising therefrom. Drs. Appollo, Logan, Logue, Mahon, Walsh and Liebelt are hereby authorized as plaintiff's treating physicians. Dr. Leibelt is designated as plaintiff's treating physician for his back condition. Plaintiff is entitled to authorization of and payment for a neuropsychological evaluation of plaintiff by Dr. L. Randolph Waid. Plaintiff is entitled to reimbursement for travel expenses to all medical appointments. N.C. Gen. Stat. §§97-19; 97-25.
4. Plaintiff is not entitled to payment of Mrs. Sampson's psychological counseling, which is not treatment for a compensable condition for which defendant is obligated to pay pursuant to N.C. Gen. Stat. § 97-25. Plaintiff is likewise not entitled to payment of Mrs. Sampson's attendant care services which has not been proven to be medically necessary. N.C. Gen. Stat. §§ 97-19; 97-25.
5. Defendant's motion for attorney's fees for the cancellation of Dr. Smid's deposition is granted. Defendant's attorney is entitled to a reasonable attorney's fee of $500.00 as a sanction. Rules 605(5) and 802(1), N.C. Workers' Compensation Rules. Defendant's motion for attorney's fees for unreasonable delays during the depositions of Dr. Gualtieri and Dr. Currin is hereby denied.
6. The defense of this claim was not reasonable in that defendant had no reasonable grounds to delay plaintiff's medical treatment or to refuse to authorize medical treatment that was recommended by physicians within the chain of referral from plaintiff's authorized treating physicians. Plaintiff is, therefore, entitled to an award of attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1. Sparks v. Mountain BreezeRestaurant, 55 N.C. App. 663, 286 S.E.2d 575 (1982).
7. The prosecution of this claim was reasonable and not stubborn, unfounded litigiousness and, therefore, defendant is not entitled to attorney's fees pursuant to N.C. Gen. Stat. §97-88.1. Sparks v. Mountain Breeze Restaurant, supra.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay plaintiff permanent and total disability compensation at a rate of $535.73 per week from March 22, 2001 and continuing for plaintiff's lifetime.
2. Defendant shall provide plaintiff medical treatment for the conditions caused by his March 12, 2001 compensable injury so long as the same is reasonably designed to effect a cure, provide relief or lessen plaintiff's period of disability. The treatment which plaintiff is entitled to receive includes, but is not limited to, biofeedback, cognitive retraining, cognitive behavioral therapy, psychological counseling, psychiatric treatment, Botox injections, Viagra, treatment for post-traumatic Parkinson's syndrome, further treatment for his right knee, treatment for ulnar neuropathy, anterior cervical decompression fusion at C4-5 and C5-6, plaintiff's December 20, 2004 evaluation with Dr. Liebelt, and any other treatment necessitated by the compensable conditions and injuries plaintiff sustained and the complications arising therefrom. Drs. Appollo, Logan, Logue, Mahon, Walsh and Liebelt are hereby authorized as plaintiff's treating physicians and Dr. Leibelt is designated as plaintiff's treating physician for his back and knee condition. Defendant shall timely reimburse plaintiff for travel expenses to all of his medical appointments.
3. Defendant shall authorize and provide a neuropsychological evaluation of plaintiff by Dr. Waid. Defendant's motion to compel plaintiff to attend a psychological evaluation with Dr. Leach and an IME with Dr. Fozdar is hereby GRANTED and plaintiff is ORDERED to submit to said evaluations.
4. A reasonable attorney's fee of 25% of the compensation due plaintiff under Paragraph 1 of this Award is approved for plaintiff's counsel and defendant shall pay that sum directly to plaintiff's counsel.
5. Plaintiff's attorney shall pay to defense attorney a reasonable attorney's fee of $500.00 as a sanction for the cancellation of Dr. Smid's deposition.
6. Pursuant to N.C. Gen. Stat. § 97-88.1, plaintiff's attorney is hereby awarded a reasonable attorney's fee $5,000.00 to be paid by defendant in addition to the attorney's fee awarded in Award Paragraph 4.
7. Defendant's motion for attorney's fees under N.C. Gen. Stat. § 97-88.1 is DENIED.
 ORDER
1. Defendant is hereby ordered to cease and desist its excessive delays in providing plaintiff treatment prescribed by his authorized treating physicians. Speciality Risk Sevices, defendant's servicing agent, is ORDERED to designate to plaintiff and the Commission within 10 days of the filing date of this Opinion and Award a claims adjuster who is responsible for making decisions about the authorization of medical treatment.
2. Many of the issues involving payment of the bills for medical providers are now resolved because the outstanding bills have now been paid. However, pursuant to N.C. Gen. Stat. §97-18(i), defendant shall pay a 10% late payment penalty to the medical providers for any unpaid and properly submitted bills for services rendered. Disputes involving payment of medical bills may be referred to Christine Williams, Chief Medical Fee Examiner for the Commission.
3. Defendant appealed from the November 21, 2005 order of Deputy Commissioner Taylor awarding expert witness fee of $1,000.00 to Dr. Gualtieri and $4,080.00 to Dr. Mahon. Upon review of the depositions and the time and preparation involved in the depositions, the Full Commission upholds the expert witness fee of $1,000.00 to Dr. Gualtieri but vacates the award to Dr. Mahon and hereby approves an expert witness fee of $2,000.00 to Dr. Mahon.
4. Because of the complexity of this case and the significant delays in plaintiff's receiving the necessary and required treatment, this matter is hereby referred to the Industrial Commission Nurses Section for assignment of a Commission nurse to facilitate the case management.
This 9th day of August 2006.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER